1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

JUDITH DARBY

VERSUS                    NO. 2:19-CV-12622

DAVID SNOW, ET AL

DEPOSITION OF SADIE GENTRY, 2421 Royal
Street, New Orleans, Louisiana 70116, taken in
the Law Offices of Philip Costa, 650 Poydras
Street, Suite 1460, New Orleans, Louisiana on
Monday, November 1, 2021.



HEIDI LaFOND DENNIS
ALLIANCE COURT REPORTERS, LLC
(504) 488-6624



Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 4

1                    S T I P U L A T I O N

2

3         It is stipulated and agreed by and

4    between counsel for the parties hereto that

5    the deposition of the aforementioned witness

6    is hereby being taken under the Federal Rules

7    of Civil Procedure, for all purposes, in

8    accordance with the law;

9         That the formalities of reading and

10   signing are specifically not waived;

11        That the formalities of sealing,

12   certification and filing are specifically

13   waived;

14        That all objections, save those as to

15   the form of the questions and the

16   responsiveness of the answer, are hereby

17   reserved until such time as this deposition,

18   or any part thereof, may be used or sought to

19   be used in evidence.

20

21              *    *    *    *    *

22        HEIDI LaFOND DENNIS, Certified Court

23   Reporter, in and for the Parish of Orleans,

24   State of Louisiana, officiated in

25   administering the oath to the witness.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 5

```
 1                    SADIE GENTRY,
 2    after having been first duly sworn by the
 3    above-mentioned court reporter, did testify as
 4    follows:
 5    EXAMINATION BY MR. BEZOU:
 6    Q.    Good morning, Ms. Gentry.  My name is
 7    Jacques Bezou, and I represent Judith Darby
 8    regarding a personal injury lawsuit that's
 9    been filed against yourself and David Snow and
10    Albert Decourt; you're familiar with that
11    lawsuit?
12    A.    Yes.
13    Q.    Have you ever given a deposition
14    before?
15    A.    No.
16    Q.    There are some background rules.  One
17    is: If you don't understand a question I ask
18    you, please ask me to rephrase it, let me know
19    you don't understand it; if you answer it, I'm
20    going to assume that you understood the
21    question, okay?
22    A.    Okay.
23    Q.    The second ground rule is that we have
24    to respond verbally, out loud because the
25    court reporter cannot take down head nods or
```

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 6

1    head shakes, okay?

2    A.    Okay.

3    Q.    Please try to avoid saying "uh-huh" or

4    "un-un", say "yes" or "no," it transcribes so

5    much more easily for the court reporter, okay?

6    A.    Yes.

7    Q.    Do you understand you are under oath

8    today same as if you were in court?

9    A.    Yes.

10   Q.    Give me your full name, please?

11   A.    Sadie Ann Gentry.

12   Q.    Your middle name is?

13   A.    Ann, A-N-N.

14   Q.    Have you ever had a middle name of

15   "Sutton"?

16   A.    That was my maiden name.

17   Q.    And so "Gentry" was a married name?

18   A.    Yes.

19   Q.    Tell me, is that your first marriage?

20   A.    No.

21   Q.    When was the first time you were

22   married?

23   A.    When?

24   Q.    Yes.

25   A.    A long time ago.  I don't remember the

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 7

1    date.  It was about sixty years ago.

2    Q.    What was the gentleman's name?

3    A.    George Lee.

4    Q.    How did that marriage end?

5    A.    Divorce, and he died.

6    Q.    Where did you all reside?

7    A.    He and I?

8    Q.    Yes, ma'am.

9    A.    He was a Civil Engineer, his job was

10   all over Scotland and England and --

11   Q.    I meant to ask you this when we

12   started, are you on any medication that you

13   believe would affect your ability to answer

14   truthfully?

15   A.    I'm on a bunch of medication but none

16   that would affect my truth --

17   Q.    Sure.  Does any of the medication

18   you're on today affect your memory?

19   A.    No.  My memory is fairly sharp.

20   Q.    After you were married to Mr. Lee, what

21   year did that end, if you know?

22   A.    (NO RESPONSE)

23   Q.    Ballpark, it doesn't have to be

24   specific?

25   A.    Around '68 -- '65, '68.

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 8

```
1    Q.    Did you marry again after my Mr. Lee?

2    A.    I married Brian Gentry.

3    Q.    How did that -- you're not still

4    married to Mr. Gentry?

5    A.    He died.  He died in '72.

6    Q.    Did you ever remarry after Mr. Gentry?

7    A.    No.

8    Q.    You are familiar with David Snow?

9    A.    Yes.

10   Q.    Describe your relationship with Mr.

11   Snow.

12   A.    I've known him since '73 when I first

13   came here.  We've been friends for a very long

14   time, and we've lived together for the last

15   maybe, oh, after Katrina, ten years.

16   Q.    So after Katrina?  That's how everyone

17   dates everything here.

18   A.    Yes.

19   Q.    Have you and Mr. Snow, do you consider

20   yourself to be a couple?

21   A.    What do you mean?

22   Q.    A romantic couple or roommates?

23   A.    Romantic, I suppose.

24   Q.    Have y'all been a romantic couple since

25   you knew him in '73?
```

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 9

1    A.    No, not since '73; for the last 10

2    years or so.

3    Q.    Have y'all ever owned property

4    together?

5    A.    What do you mean?

6    Q.    Purchased a home or land together?

7    A.    No -- wait, we had a house in

8    Mississippi.

9    Q.    Tell me about that.  Where was it?

10   A.    It was close, a bit North of Picayune.

11   We bought it after Katrina because we had

12   bought a house in Pass Christian but it got

13   washed away; we bought it in February of

14   whatever year Katrina was.

15   Q.    '05.

16   A.    It washed away. So then we used the

17   money I got from that and bought the place in

18   Mississippi.

19   Q.    So there's two properties in

20   Mississippi, the one that washed away and then

21   the second one in Picayune?

22   A.    Yes.

23   Q.    Tell me about the first piece of

24   property that you all purchased that washed

25   away, how did that purchase happen?  Did you

Deposition of Sadie Gentry                         Taken: 11/01/2021

Page 10

1    put up the money, did he put up the money, did

2    y'all both put up some money?

3    A.    I can't remember.  I don't remember

4    what happened.

5    Q.    Do you recall if there was a mortgage

6    on that property?

7    A.    No.

8    Q.    So it was paid for cash?

9    A.    Uh-huh (affirmative response).

10   Q.    But you don't recall if Mr. Snow would

11   have put up all the cash or if you would have

12   put up all the cash?

13   A.    I don't remember.

14   Q.    Describe that property for me, was it

15   just a house?

16   A.    It was a little house a couple of

17   blocks from the beach.

18   Q.    And then Katrina came?

19   A.    And there was nothing left but the

20   steps.

21   Q.    And then the subsequent piece of

22   property, what type of property was that, the

23   next one that you bought?  Was there another

24   home?

25   A.    We moved back to New Orleans.

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 11

1    Q.    My understanding is you had two

2    properties in Mississippi, the one that got

3    blown away from Katrina --

4    A.    We had it for a few months.

5    Q.    That was the one that got blown away

6    from Katrina that you only had a few months?

7    A.    Yes.

8    Q.    One more ground rule that I forgot to

9    mention, people -- I'm very bad about this, we

10   start talking before the other person is

11   finished with their stuff and it's very hard

12   for the court reporter, so I will try my best

13   to let you fully answer.  You're a very soft

14   spoken individual so I will do my best.

15   A.    Okay.

16   Q.    After Katrina, the second piece of

17   property you purchased in Mississippi, how

18   long did you have that piece of property?

19   A.    Until --

20   Q.    If I represented to you that it sold in

21   May of '19; could that be correct?

22   A.    That's about right.

23   Q.    So you would have had that from

24   approximately --

25   A.    I sold it for less than I paid for it.

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 12

1    Q.    It was purchased in late '05, early
2    2006?
3    A.    Early '05, April, something like that.
4    Q.    So when the property got destroyed by
5    Katrina, did y'all receive insurance money?
6    A.    Yes.
7    Q.    Do you recall was the insurance check
8    made out to you, to Mr. Snow or both of you?
9    A.    I don't remember, but we used all of it
10   on the other property.
11   Q.    Did you have to put in additional funds
12   beyond the amount of the check from the
13   insurance company to purchase the second?
14   A.    No.  It was almost the same.
15   Q.    Was that property 2451 Dewey Road in
16   Carriere, Mississippi?
17   A.    It was Dewey Road, I don't remember if
18   it was 2451.
19   Q.    And so when was that property sold -- I
20   believe we said May of '19; does that sound
21   right?
22   A.    That's about right.
23   Q.    Did you attend the closing for the sale
24   of that property?
25   A.    I don't remember.  I don't think so.

Deposition of Sadie Gentry                     Taken: 11/01/2021

Page 13

```
 1   Q.    The check that you all received, was
 2   there -- there was no mortgage on that
 3   property either?
 4   A.    No.
 5   Q.    So all the proceeds would have gone to
 6   you and Mr. Snow?
 7   A.    The proceeds from the Mississippi
 8   property went into buying the property on
 9   Royal Street.
10   Q.    Do you recall, when that house was
11   sold, was the check made out to you
12   individually or was it made out to Mr. Snow?
13   A.    I don't remember.
14   Q.    My understanding is, you all took that
15   money from the sale of the second Mississippi
16   property and purchased a property at 2421
17   Royal Street; is that correct?
18               MR. COSTA:
19                    I object to the form of the
20   question because she has not testified
21   regarding that, what you just said.
22               MR. BEZOU:
23                    I'm sorry, could you repeat
24   the question for me?
25   (THE FOLLOWING QUESTION WAS READ BACK IN IT'S
```

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 14

1    ENTIRETY:

2    Q.    My understanding is, you all took that

3    money from the sale of the second Mississippi

4    property and purchased a property at 2421

5    Royal street; is that correct?)

6              MR. COSTA:

7                   She has not testified to that

8    yet.

9    EXAMINATION BY MR. BEZOU:

10   Q.    It's my understanding -- I'm asking if

11   I'm right or wrong?

12   A.    I sold my condo on Decatur and used

13   that to pay for the property on Royal Street.

14   Q.    So while you owned this property in

15   Mississippi, you also owned other property in

16   New Orleans?

17   A.    I've had the condo for 20 years or

18   more.

19   Q.    What was the address of that, was that

20   1319 Decatur?

21   A.    Right.

22   Q.    You sold that condo in June of 2019; is

23   that correct?

24   A.    Uh-huh (affirmative response).

25   Q.    And so with the proceeds from the

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 15

1    Decatur condo and the Mississippi property,

2    you all did what?

3    A.    Bought the Royal Street property.

4    Q.    What was the sale price of the Royal

5    Street property; if you remember?

6    A.    I don't remember.

7    Q.    Was the Royal Street property more or

8    less than the proceeds from the Mississippi

9    property?

10   A.    The Mississippi property wasn't worth

11   very much.

12   Q.    Do you know how much the Mississippi

13   property sold for?

14   A.    I can't remember.  I know it was less

15   than what we paid for it.

16   Q.    Can you give me a ballpark of what you

17   paid for it, was it $10 or half a million

18   dollars?

19   A.    I can't remember.  I'm thinking about

20   eight or nine thousand dollars.

21   Q.    I'm sorry, repeat that?

22   A.    For some reason I have 9,000 in my

23   head.

24   Q.    You believe you sold that property for

25   $9,000?

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 16

1    A.    It must have been more than that.  I
2    can't remember.
3    Q.    Do you know what you purchased the
4    Royal Street property for?
5    A.    Not off the top of my head, no.
6    Q.    Was it less than a million dollars or
7    more than a million dollars?
8    A.    Less.
9    Q.    Was it less than $500,000 or more than
10   $500,000?
11   A.    I don't remember.  Somewhere around
12   there.
13   Q.    Somewhere around $500,000?
14   A.    Less than that.  I don't remember.
15   Q.    Did Mr. Snow have an ownership interest
16   in the Mississippi properties, to your
17   knowledge?
18   A.    Yes, we both owned it.
19   Q.    And so when this property was purchased
20   on Royal, that would have been purchased using
21   the monies that you all had together from the
22   sale of the Mississippi property along with
23   some of your money from the sale of your
24   condo; is that correct?
25   A.    I think that's right.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 17

1    Q.    Do you know approximately how much Mr.

2    Snow contributed to the purchase of the

3    property at 2421 Royal?

4    A.    I can't remember.

5    Q.    Do you know if it was more than --

6              MR. COSTA:

7                   Wait.  I object.  She didn't

8    -- it has not been --

9              MR. BEZOU:

10                  Please make an objection as to

11   the form.

12             MR. COSTA:

13                  I object to the form.  You are

14   assuming things that are not in evidence.

15             MR. BEZOU:

16                  That's not a proper objection.

17   This is a discovery deposition so please

18   reserve your objections as to the form only.

19             MR. COSTA:

20                  But you're asking questions

21   that have not been established.

22             MR. BEZOU:

23                  That's not a proper objection.

24             MR. COSTA:

25                  I object to the form.  Re-ask.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 18

1    EXAMINATION BY MR. BEZOU:

2    Q.    Do you know if Mr. Snow contributed

3    anything to the purchase of the 2421 Royal

4    Street property?

5    A.    I don't remember how it got sorted out.

6    My memory is really -- I didn't realize I was

7    going to have to check all this stuff out.  I

8    don't remember.

9    Q.    That's okay.  The public records are

10   what they are, I'm just trying to get what you

11   remember and understand, and if you don't

12   recall something, "I don't remember" is a

13   perfectly acceptable answer.

14   A.    I don't remember.

15   Q.    This is not a memory test.  And I know

16   I'm asking you about things years ago.

17   A.    Years ago, I can remember things better

18   than I can in the last five years.

19   Q.    Me too.  But it's your understanding as

20   we sit here today that a portion of the

21   purchase price for 2421 Royal came from the

22   sale of your condo --

23   A.    Uh-huh (affirmative response).

24   Q.    -- and the other portion would have

25   come from the sale of the property that you

Deposition of Sadie Gentry                                    Taken: 11/01/2021

Page 19

1    and Mr. Snow owned together in Mississippi?

2    A.    Most of it came from the condo.

3    Q.    The property at 2421 Royal, is that in

4    your name, in Mr. Snow's name or both?

5    A.    In my name.

6    Q.    Do you know why it's in your name?

7    A.    No.  I supposed because I put up most

8    of the money.  I don't know.

9    Q.    Do you know if that property was

10   purchased after the incident that we're here

11   about today?

12   A.    That's two years ago.

13   Q.    So the date that Ms. Darby was injured,

14   I'll represent to you was October of 2018,

15   okay, and my records reflect --

16   A.    We bought the property earlier in the

17   year in '18.

18   Q.    My records reflect that that property

19   was purchased in April of 2019.

20   A.    Really?

21   Q.    Yes, ma'am.

22   A.    Okay.

23   Q.    So I just want to see if your memory --

24   A.    My memory is -- I don't know.

25   Q.    Prior to April of 2019, you were aware

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 20

1    that Ms. Darby had suffered an injury

2    involving Mr. Snow's boat the BIRD OF TIME?

3    A.    No.

4    Q.    So prior to April of 2019, you didn't

5    know that Ms. Darby had fallen attempting to

6    board the BIRD OF TIME?

7                   MR. COSTA:

8                         I object because that's not in

9    evidence.

10                  MR. BEZOU:

11                        You can object to the form but

12   that's not a proper objection.

13                  MR. COSTA:

14                        You're assuming --

15                  MR. BEZOU:

16                        This is different than Mr.

17   Snow's deposition which was taken for trial

18   purposes.

19                  THE WITNESS:

20                        Repeat the question.

21   EXAMINATION BY MR. BEZOU:

22   Q.    In April of 2019 when you purchased the

23   property at 2421 Royal Street in your name

24   only, were you aware that Ms. Darby had been

25   injured in an incident involving the BIRD Of

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 21

1    TIME?

2    A.    No.  I knew that she had fallen in the

3    water the last -- the last boat trip we went

4    to was '19 or '18?

5    Q.    My records reflect '18.

6    A.    '18.

7    Q.    And you witnessed -- did you witness

8    the incident?

9    A.    I was there.

10   Q.    And so you would have witnessed her

11   fall prior to purchasing 2421 Royal and

12   placing it in your name only, correct?

13   A.    It's totally unrelated.  I saw her and

14   she fell and we bought the house have nothing

15   to do with each other.  I can't --

16   Q.    I'm sorry, I couldn't make out the last

17   part of that?

18   A.    I can't see a connection.  I don't

19   understand the question.

20   Q.    It's okay if you don't know why I'm

21   asking you the question.  What I'm asking you

22   is, when you purchased the house on Royal, the

23   property at 2421 Royal, were you aware that

24   Ms. Darby had fallen involving the BIRD OF

25   TIME the October prior?

Deposition of Sadie Gentry                           Taken: 11/01/2021

Page 22

1    A.    Ms. Darby falling in the water really

2    had nothing to do with the boat at the time;

3    she fell in the water.

4    Q.    I appreciate your answer.

5              MR. COSTA:

6                   That's her answer.

7              MR. BEZOU:

8                   I'm not arguing with her,

9    Phil, please.

10             MR. COSTA:

11                  You're assuming that she knew

12   that Ms. Darby was injured and she's saying

13   she did not know Ms. Darby was injured.

14             MS. GENTRY:

15                  I knew she fell in the water.

16   EXAMINATION BY MR. BEZOU:

17   Q.    Had you received a letter from any

18   attorneys, not your attorney but from any

19   attorneys on behalf of Ms. Darby between

20   October of 2018 and April of 2019?

21   A.    I have no idea when I received it.

22   Somebody showed up at the door with a piece of

23   paper, I didn't know what it was and I can't

24   remember -- it was one of those years.  I

25   don't remember when.

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 23

1    Q.    Is it safe to say that your memory of

2    2018/2019 is not very clear?

3    A.    It's not very clear.

4    Q.    Did you and Mr. Snow have any

5    discussions about putting 2421 Royal in your

6    name only to shield him from liability?

7    A.    No.  There wasn't any question.

8    Q.    Did you and Mr. Snow have any

9    discussions in 2018 after Ms. Darby fell in

10   the water about the incident?

11   A.    No.

12   Q.    No?

13   A.    No.  It was an unfortunate thing but it

14   wasn't a big deal.  She'd fallen and she got

15   fished out.

16   Q.    Have you all discussed the fall, you

17   and Mr. Snow at any point after it occurred

18   until present day?

19   A.    When all the paperwork started coming

20   in, yes. It was a big surprise when all this

21   stuff started happening; we didn't expect

22   anything like this to happen.  The woman fell

23   in the water, she got fished out and she

24   walked home.

25   Q.    My question to you is, did you and Mr.

Deposition of Sadie Gentry                              Taken: 11/01/2021

Page 24

1    Snow have any discussions about the fall?

2    A.    No.

3    Q.    Have you ever discussed it?

4    A.    Not really, no.

5    Q.    So when you got served with a lawsuit

6    and he got served with a lawsuit, you all

7    didn't talk about it?

8    A.    No.  First we heard Albert saying he

9    had been served with something, and then

10   months later, someone showed up and gave me

11   the same thing, and then several months after

12   that, David got the same thing served.

13   Q.    And you currently live with Mr. Snow in

14   that Royal Street property, correct?

15   A.    Uh-huh (affirmative response).

16   Q.    And so after you all were served,

17   yourself and Mr. Decourt and David, tell me

18   about any conversations you've had with, let's

19   start with Mr. Snow first regarding the fall.

20   A.    We really haven't.  It wasn't much to

21   discuss.

22   Q.    There's a difference between there was

23   nothing to discuss and there wasn't much to

24   discuss; have you had any conversations

25   whatsoever about the incident, about the fall?

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 25

1   A.    I think we have discussed a little of

2   what we could both remember of the incident.

3   It doesn't seem like it now, it was a minor

4   incident.

5   Q.    Tell me about those discussions, what

6   do you recall him telling you?  What do you

7   recall saying to Mr. Snow?

8   A.    We were both very happy to be able to

9   get the big guys from the boat next door to

10  come quickly to fish her out.

11  Q.    When was that conversation?

12  A.    I suppose at the time when these papers

13  came.

14  Q.    So other than being happy that you all

15  were able to get two gentlemen to or however

16  many --

17  A.    It was two.

18  Q.    Two gentlemen to assist Ms. Darby out

19  of the water, tell me anything else you all

20  discussed?

21  A.    That's about it.  We were glad she

22  wasn't hurt.  My daughter checked her over,

23  and she walked home with her partner.

24  Q.    Who is your daughter?

25  A.    Heidi Lee.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 26

1    Q.    My understanding is Heidi is a

2    physician?

3    A.    Uh-huh (affirmative response).

4    Q.    What type?

5    A.    Psychiatrist.

6    Q.    She's not an orthopedist?

7    A.    No.

8    Q.    Does she have any background in

9    orthopedics?

10   A.    I think she did General Medicine for a

11   short time before she went into Psychiatry.

12   Q.    Do you know where her residency was?

13   A.    London, and then New York for a short

14   time.

15   Q.    Do you know if she has any experience

16   with Emergency Room Medicine?

17   A.    I suppose whatever sort of training

18   doctors get when they're in school.

19   Q.    How long has she been a psychiatrist?

20   A.    30 years, at least.

21   Q.    Has she practiced any other form of

22   medicine besides psychiatry in the last 30

23   years, to your knowledge?

24   A.    No.

25   Q.    Who is Calvin?

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 27

1    A.    Her husband.

2    Q.    What does he do?

3    A.    An architect.

4    Q.    Does he have any medical training, to

5    your knowledge?

6    A.    No.

7    Q.    Do you know if either one of them has

8    ever worked in the maritime industry?

9    A.    No.  To my knowledge, neither of them.

10   Q.    I've had the pleasure of taking Mr.

11   Snow's deposition over a couple of days and he

12   seems to get along pretty well for being an

13   older gentleman.  Do you have to take care of

14   him at all?

15   A.    Not much.

16   Q.    Do you all travel together?

17   A.    Not really.  We haven't traveled in a

18   long time.

19   Q.    Do you own any other property other

20   than the 2421 Royal --

21   A.    Do we?

22   Q.    Do you?

23   A.    I do.

24   Q.    What other property do you own?

25   A.    I have a house on Ursuline.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 28

```
 1    Q.    Is that in your name?

 2    A.    Yes.

 3    Q.    To your knowledge, does Mr. Snow

 4    maintain any other residences?

 5    A.    No.

 6    Q.    Do you know if he owns any other

 7    property in the City of New Orleans?

 8    A.    No.

 9    Q.    What about otherwise, outside the city?

10    A.    No.

11    Q.    Do you all discuss finances with each

12    other?

13    A.    Not much, no.

14    Q.    Tell me about "not much."  To what

15    extent do you?

16    A.    We both contribute to a bank account

17    toward our mutual expenses.

18    Q.    Is that a joint bank account?

19    A.    Uh-huh (Affirmative answer)

20    Q.    Is that the bank account that the

21    expenses for the home are paid out of?

22    A.    Yes.

23    Q.    What about property taxes, are property

24    taxes on the 2421 Royal Street property paid

25    together?
```

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 29

1   A.    From the joint account, yes.

2   Q.    What about if there was maintenance to

3   be done, say it needed new plumbing or a new

4   roof, how would that be paid for?

5   A.    The joint account.

6   Q.    Paid together?

7   A.    Yes.

8   Q.    Do you believe Mr. Snow to be honest?

9   A.    Yes.

10  Q.    Trustworthy?

11  A.    Yes.

12  Q.    I wouldn't expect you to answer

13  otherwise.  You know we're here today because

14  Ms. Darby was injured during that Madisonville

15  Wooden Boat Festival in 2018, and it's my

16  understanding that Mr. Snow had his boat, the

17  BIRD OF TIME at the boat festival that year;

18  is that correct?

19  A.    Yes.

20  Q.    Do you know how long Mr. Snow had owned

21  that boat?

22  A.    I think two years, three years; not

23  very long.

24  Q.    How many times had you been on that

25  boat?

Deposition of Sadie Gentry                         Taken: 11/01/2021

Page 30

1    A.    Probably about twice a year.

2    Q.    So maybe six times total?

3    A.    Yes.

4    Q.    Had you ever -- my understanding is Mr.

5    Snow had taken that boat to the Madisonville

6    Wooden Boat Festival in 2016, in 2017 and

7    2018; does that sound correct?

8    A.    I remember 2017, I don't remember '16.

9    Q.    Is it possible?

10   A.    I suppose.

11   Q.    If he did take it in 2016, would you

12   have been with him at the festival?

13   A.    I would have gone.

14   Q.    How many times do you think you've been

15   to the Madisonville Wooden Boat Festival

16   either as a spectator or as a participant

17   onboard Mr. Snow's boat?

18   A.    Seven or eight times maybe.

19   Q.    So is that an event that you -- did you

20   go to that with Mr. Snow before he started

21   bringing BIRD OF TIME?

22   A.    Yes.

23   Q.    Do you ever attend the Captain's Ball?

24   A.    Yes.

25   Q.    Do you know what years you would have

Deposition of Sadie Gentry                      Taken: 11/01/2021

Page 31

1    attended the Captain's Ball?

2    A.    The last two anyway.   Maybe one before

3    that.

4    Q.    So '17 and '18 for sure?

5    A.    I'm pretty sure.

6    Q.    At the Captain's Ball, do you see

7    friends that you've encountered before or?

8    A.    Not really.   David knows most of the

9    people there, I don't.

10   Q.    It's more his crowd?

11   A.    Yes.

12   Q.    Do you know how he knows people there?

13   A.    I suppose from having a boat for many

14   years.

15   Q.    So a lot of people from past boat

16   festivals and they keep coming back?

17   A.    Yes.

18   Q.    My understanding is at the boat

19   festival, they go, people who bring their

20   boats to show come in on say a Friday and then

21   the festival is Saturday and Sunday; is that

22   your understanding?

23   A.    Yes.

24   Q.    And so when the boats come in on Friday

25   and Mr. Snow would bring his boat, would you

Deposition of Sadie Gentry                                    Taken: 11/01/2021

Page 32

1    ride in the boat with him or would you meet

2    him in Madisonville?

3    A.    I would ride with him most of the time.

4    Q.    So in 2018, you would have ridden on

5    the BIRD OF TIME with him to the festival?

6    A.    Yes.

7    Q.    Tell me about that.  Where did you all

8    come from that, the Friday for the 2018 boat

9    festival?

10   A.    From where the boat was moored, at

11   Albert's house, Albert's trailer.

12   Q.    Is that around Lacombe or Slidell

13   somewhere?

14   A.    Slidell.  I can't remember.  I know how

15   to get there but I don't know what part of

16   Slidell it's called.

17   Q.    Tell me about that.  You get there

18   Friday morning, I assume?

19   A.    Yes.

20   Q.    Who all was on the boat that day when

21   you left Slidell?

22   A.    I can't remember whether Heidi came

23   that year or the year before.  She came one

24   year I know because Albert let her steer it

25   for a few minutes.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 33

1   Q.    Was David on the boat?

2   A.    Yes.

3   Q.    Yourself?

4   A.    Yes.

5   Q.    Albert?

6   A.    Yes.

7   Q.    Maybe Heidi?

8   A.    Maybe Heidi or maybe that was the year

9   before, I don't remember.

10  Q.    Would Albert have accompanied Heidi if

11  Heidi was there?

12  A.    I don't think so.

13  Q.    So as best you a can recall, we know it

14  was at least yourself, Mr. Snow and Mr.

15  Decourt and possibly Heidi when you left

16  Slidell?

17  A.    Possibly Albert's sister, she came one

18  year.

19  Q.    What's her name?

20  A.    Barbara.

21  Q.    I think I know the answer to this, but

22  do you recall what date that Friday would have

23  been?

24  A.    No.

25  Q.    Can you tell me what the weather was

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 34

1    like that day?

2    A.    It was fine.  I don't remember getting

3    wet or anything.

4    Q.    You would have remembered if it was

5    rough in the lake that day, so calm?

6    A.    Yes, I think it was normal.

7    Q.    Do you know how long it took you all to

8    get from Slidell to Madisonville?

9    A.    It was about four or five hours.

10   Q.    Do you know approximately what time you

11   all arrived in Madisonville?

12   A.    Late afternoon.

13   Q.    Did you ever steer the boat?

14   A.    No.  I steered on other boats but I

15   have not steered that one.

16   Q.    So you're less a captain and more a

17   director of festivities?

18   A.    No.  I brought the sandwiches.

19   Q.    Tell me about when you all arrived in

20   Madisonville in 2018, you come up the river?

21   A.    We call on the corner of the river so

22   they'll know you're coming, and they tell you

23   where to go.  That year it was easy because we

24   were almost the same place we were the year

25   before, and when you get to the level or the

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 35

1    spot you're going to, you wait til the guys

2    come up, and Albert threw them the line and

3    back it in.

4    Q.    Are you familiar with the Madisonville

5    Bridge?

6    A.    Yes, we were down from the bridge.

7    Q.    I'm trying to picture in my mind where

8    exactly the boat was docked.  Would you go

9    under the bridge?

10   A.    No.

11   Q.    So you were docked --

12   A.    -- we were downriver from the bridge.

13   Q.    And if you're coming up the river from

14   the lake, that would have been on the

15   left-hand side of the river?

16   A.    Yes, left-hand side.

17   Q.    Do you know where Morton's Seafood

18   Restaurant is?

19   A.    We were right across from there.

20   Q.    So you weren't far from the bridge at

21   all?

22   A.    No.

23   Q.    So if I understood your testimony a

24   moment ago, you call, they tell you where

25   you're going to go, you pull up in the boat,

Deposition of Sadie Gentry                              Taken: 11/01/2021

Page 36

1     there's people -- you said people, would they

2     be from the festival?

3     A.     Yes.

4     Q.     And then someone would throw a bow line

5     to them?

6     A.     No.

7     Q.     A stern line?

8     A.     Yes.  Someone has to put the anchor out

9     forward and then they throw the lines to the

10    guys on the shore and they tie up to the --

11    Q.     As you're preparing to anchor, who is

12    operating the boat?

13    A.     Albert.

14    Q.     Whose putting out the anchor while

15    Albert is operating the boat?

16    A.     Albert.

17    Q.     So you would have gone to the bow of

18    the boat to drop the anchor, correct?

19             MR. COSTA:

20                You said "you," she's not

21    testified to that, she said "Albert."

22    EXAMINATION BY MR. BEZOU:

23    Q.     I'm sorry, so Albert's driving the boat

24    --

25    A.     -- but then he goes forward and drops

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 37

1     the anchor.
2              MR. BEZOU:
3                   I thought she said "I do"?
4              MS. GENTRY:
5                   No.
6     EXAMINATION BY MR. BEZOU:
7     Q.    Albert puts the boat in neutral, so
8     it's not moving anymore, he goes and drops the
9     anchor, correct?
10    A.    Yes.
11    Q.    And then he comes back to the helm?
12    A.    Uh-huh (affirmative response).
13    Q.    So what does he do next?
14    A.    Puts it in place.
15    Q.    Does he back the boat up?
16    A.    Yes.  Buoys on the back of the boat so
17    we don't bump into --
18    Q.    And there's lines that get thrown,
19    correct?
20    A.    The lines get thrown and one of them
21    goes around those posts.
22    Q.    I'll refer to those posts as "pilings"
23    today just so we're on the same page.  When
24    the lines get thrown, are these lines thrown
25    from someone onshore to the boat or is someone

Alliance Court Reporters, LLC
(504) 488-6624  alldepo@bellsouth.net

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 38

1    on the boat throwing a rope to someone onshore

2    to help?

3    A.    I think it's from the boat to the

4    shore.

5    Q.    Do you recall who threw the lines out

6    when you docked in 2018?

7    A.    No, but it's not very far.

8    Q.    So could you have thrown the lines out?

9    A.    I could have but I don't think so, I

10   don't believe I did.  I'm pretty sure I

11   wouldn't.

12   Q.    It's my understanding once the anchor

13   is set and you've got lines tying, connecting

14   the boat to pilings --

15   A.    Uh-huh (affirmative response).

16   Q.    Are there pilings on both sides?

17   A.    I think so, yes.

18   Q.    Once you're tied up, how far away from

19   the bulkhead, the shore is the stern of the

20   boat?

21   A.    About from here to you -- no, less than

22   that.  Like from -- just a couple of feet,

23   two, three feet but it would vary with the

24   tide.

25   Q.    When the tide would go up and down, the

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 39

1    distance between the stern and the boat would

2    vary, right?

3    A.    Yes.

4    Q.    So once the lines were thrown, would

5    you all just hop across that gap to get

6    onshore or was there some method, some manner

7    that you exited?

8    A.    Put the plank out.

9    Q.    Tell me about the plank.

10   A.    It was a big heavy plank, about that

11   thick and about that wide. (INDICATING)

12   Q.    Heavier than you could lift?

13   A.    Yes, especially if it's wet to cross

14   onto.

15   Q.    Do you think the plank was about 12

16   inches wide?

17   A.    (INDICATING)  About that, about 12

18   inches.

19   Q.    Do you know how long the plank was?

20   A.    I don't know for sure.

21   Q.    Was it longer than this conference

22   table?

23   A.    I would say a bit shorter.

24   Q.    Did the BIRD OF TIME stay docked in

25   that same spot for the entire boat festival?

Deposition of Sadie Gentry                        Taken: 11/01/2021

Page 40

1    A.    Yes.

2    Q.    When the boat was being docked and then

3    the plank was put out, where were you during

4    that docking process?

5    A.    Tidying up down below.

6    Q.    I haven't been onboard this boat, does

7    it have a galley or some cabin down that you

8    can go?

9    A.    Yes.  I had things to put away.

10   Q.    So could you see what was going on or

11   you just knew that they were docking the boat?

12   A.    I knew they were docking the boat. I

13   probably wasn't paying much attention because

14   I wanted to tidy up.

15   Q.    It wasn't your job that day?

16   A.    No.

17   Q.    There's a slot for a boat to the left

18   and a slot for a boat to the right; is that

19   correct?

20   A.    There was a slot on the -- facing left.

21   Q.    If you're at the shore looking out at

22   the river?

23   A.    On the upriver side there was no place.

24   Q.    Was there a place for a boat to go

25   upriver?

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 41

```
 1    A.    Yes, there were a couple of dinghies
 2    there.
 3    Q.    There were a couple of dinghies?
 4    A.    Yes, so maybe they were going to put
 5    another boat there, I don't know.
 6    Q.    So there wasn't a big boat to the left?
 7    A.    No, there was a big boat on the
 8    downriver side.
 9    Q.    Was it already there when you all
10    docked there?
11    A.    Uh-huh (Affirmative response)
12    Q.    Can you describe that boat for me?
13    A.    Not really.  It was bigger than us.
14    Q.    Big.  Was it white, was it gray?
15    A.    Whitish.
16    Q.    Do you know if it was --
17    A.    I don't think it was the one that the
18    boys were on, they were on a bigger boat that
19    was two over.  I'm not very sure about that.
20    Q.    When you said "the boat the boys were
21    on," the gentlemen who helped Ms. Darby out of
22    the water?
23    A.    Uh-huh (Affirmative response)
24    Q.    So is it your understanding that they
25    were not on a boat directly adjacent to the
```

Deposition of Sadie Gentry                           Taken: 11/01/2021

Page 42

1    BIRD OF TIME but on a boat farther down?

2    A.    I think they were two down but they may

3    not have been, I don't remember.  I wasn't

4    aware of having a bunch of guys on the boat

5    next-door to us; it seemed to me it was fairly

6    quiet.

7    Q.    Do you know what time you all docked,

8    approximately?

9    A.    I would think about five.

10   Q.    Five p.m. on Friday?

11   A.    Yes.  I'm not sure, but I think.

12   Q.    So throughout that whole weekend, did

13   the boats on either side of the BIRD OF TIME

14   ever change?

15   A.    No.

16   Q.    So it's your testimony that there were

17   dinghies to the upriver side --

18   A.    They came and went, and other little

19   boats came in.

20   Q.    But there was no other boat of

21   comparable size to the BIRD OF TIME or larger

22   that stayed there?

23   A.    No, not on that side.

24   Q.    What about the boat on the downriver

25   side, did it stay there throughout --

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 43

```
 1   A.    It stayed.

 2   Q.    Do you know the name of the vessel?

 3   A.    I have it written down but I can't

 4   remember.

 5   Q.    You have notes about the festival?

 6   A.    No, but somebody was talking about it

 7   and I remember the name when they said it but

 8   I don't remember.

 9   Q.    Where would you have the name of that

10   vessel written down?

11             MR. COSTA:

12                  She didn't say she had it

13   written down, she said she read notes --

14             MR. BEZOU:

15                  Could you please read back

16   that answer, it was two answers prior.

17   THE FOLLOWING ANSWER WAS READ BACK IN IT'S

18   ENTIRETY:

19   A.    I have it written down, but I can't

20   remember.)

21             MS. GENTRY:

22                  I've seen it written down

23   somewhere.  I think it was a note somebody --

24   EXAMINATION BY MR. BEZOU:

25   Q.    Do you know if you would have seen it
```

Alliance Court Reporters, LLC
(504) 488-6624  alldepo@bellsouth.net

Deposition of Sadie Gentry                              Taken: 11/01/2021

Page 44

1    written down back in 2018 or more recently?

2    A.    I've seen it written down recently or

3    somebody was talking about it.

4    Q.    Tell me about that, who would have been

5    talking about the boat next door?

6    A.    It might have been David.  It's

7    unlikely to be Heidi. I don't know who it was.

8    Q.    Do you know if that note is in your

9    home or is it in the possession of someone

10   else?

11   A.    I can't remember.  If you said the name

12   of the boat, I would say, that's it.

13   Q.    Do you know the name of the individuals

14   that were on the boat?

15   A.    It was a nautical sort of name.

16   Q.    Do you know the names of the

17   individuals that were onboard that boat?

18   A.    No.

19   Q.    Did you ever meet them?

20   A.    No.  Just to yell at them to come and

21   help get Ms. Darby out of the water and to

22   thank them afterwards.

23   Q.    So you do believe that the two

24   gentlemen who helped Ms. Darby out of the

25   water came from that larger vessel immediately

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 45

1    downriver?

2    A.    Either immediately downriver or one

3    over, I don't remember them being right next

4    to us on the boat but they were close enough.

5    Q.    And so you had to leave the boat at

6    some point during that weekend, correct?

7    A.    Oh, yeah.

8    Q.    When was the first time you would have

9    left the boat after docking?

10   A.    After we got docked in, I got out to

11   walk around a bit.  I went down to the end to

12   see all the fancy boats.

13   Q.    So when you got off the boat, how did

14   you get off?

15   A.    On the plank.

16   Q.    Can you tell me how many steps does it

17   take you to cross that plank?

18   A.    Two maybe.

19   Q.    I notice you're here today with the

20   assistance from a walker, were you utilizing

21   that walker back in 2018?

22   A.    No.  I broke a bunch of stuff. I wasn't

23   using the walker at that point.

24   Q.    You said you broke some stuff?

25   A.    Last year I broke a bunch of bones.

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 46

1    Q.    What did you break?

2    A.    Two knees, one elbow --

3    Q.    That sounds like no fun at all.

4    A.    One knee twice and then the other one.

5    So now I'm using the walker.

6    Q.    How did you break all those bones?

7    A.    I have Parkinson's and I fell down, so

8    now I'm more careful.

9    Q.    In 2018, you weren't using any device

10   to assist you to walk?

11   A.    No.

12   Q.    During the four to five hour boat ride

13   from picking up the boat until you reached

14   Madisonville, were you drinking?

15   A.    Not -- I really don't much anywhere.

16   Q.    What about David?

17   A.    He doesn't drink while on the boat, but

18   he'll have one once it's tied up.

19   Q.    What about Albert?

20   A.    He wouldn't drink while driving the

21   boat.

22   Q.    What about Heidi?

23   A.    She'd probably have one when she came

24   aboard; no one drinks while the boat is

25   moving.

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 47

1    Q.    So when you walked the plank to get off

2    the boat for the first time that Friday

3    afternoon, tell me about that.  How did you do

4    that?

5    A.    There's nothing to tell.  You step on

6    the seat at the back of the cockpit and step

7    over the lines and there's a little -- in the

8    back of the boat, not very big, step on it and

9    step onto the plank, two steps and there's

10   those two posts, that's one of the posts that

11   we were tied up to, hold onto that for

12   carrying stuff.

13   Q.    You mentioned to get up to the level of

14   where the plank meets the boat, you've got to

15   step up onto a seat in the back of the

16   cockpit, correct?

17   A.    Yes.

18   Q.    And then you said there's lines?

19   A.    The lines on the back of the boat.

20   Q.    So you have to, I assume you have to

21   pay attention to where the lines are so you

22   don't get tangled in them, trip on the lines

23   or anything?

24   A.    There are pictures of the back of the

25   boat.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 48

1    Q.    I want to know what you recall and

2    we're going to look at some pictures later,

3    but do you recall if there was a -- when you

4    say "seat," is that the back of the seat right

5    there that I'm looking at? (INDICATING)

6              MR. BARNETT:

7                   That's Exhibit D-1 from the

8    deposition --

9    EXAMINATION BY MR. BEZOU:

10   Q.    Is the back of the seat?

11   A.    That's probably, it's the bench across.

12   Q.    Is the seat just a flat box or like a

13   bench style --

14   A.    It's a bench across that way.

15   (INDICATING)

16   Q.    So that would be the back rest?

17   A.    You hold onto here, onto the top of the

18   awning, step over, it's only about that big

19   (INDICATING) and then -- it's not a big deal.

20   Q.    Did the plank look dangerous to you at

21   all?

22   A.    (SHAKES HEAD NEGATIVELY)  It's the same

23   plank we've always used.

24   Q.    You wouldn't walk onto it if it looked

25   dangerous to you?

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 49

1    A.    No.  But there would be no reason to

2    have an unsuitable plank on the back of the

3    boat.  David has been doing this for years.

4    Q.    How is the plank secured to the back of

5    the boat?

6    A.    It was heavy.

7    Q.    I appreciate that the plank was heavy,

8    but was it fastened or attached in any way to

9    the back of the boat?

10   A.    No.  I don't think so.  It would have

11   to be able to move a bit because the boat goes

12   up and down.

13   Q.    You testified earlier that due to the

14   tide, the boat would move closer and further

15   --

16   A.    Yes.

17   Q.    -- in relation to the bank, right?

18   A.    Yes.

19   Q.    It appears that this plank only has, I

20   believe it's measured, it's like 5 inches lip

21   to rest upon right now; you see what I'm

22   talking about? (INDICATING)

23   A.    About that much. (INDICATING)

24   Q.    Here's a closer photo, see that lip

25   right there?  (INDICATING)

Page 50

1   A.    Yes.

2   Q.    So I guess my question for you is, if

3   the boat is going to move in and out a little

4   bit --

5   A.    It moves up and down.

6   Q.    If it moves up and down, so your

7   testimony is it never moves in and out?

8   A.    Not unless it's a storm or strong

9   current but then you'd take it off anyway.

10  Q.    When the boat moves up and down due to

11  tides, are you aware of anything that would

12  have kept the plank resting on that little

13  ledge despite the boat's movement up and down?

14  A.    It's very heavy and it's cement about

15  there, you walk that way and there's grass.

16  Q.    I guess my question for you is this, we

17  can see here it's resting, the plank appears

18  to be resting upward a little bit on that --

19  A.    Uh-huh (affirmative response).

20  Q.    If the tide drops six inches, a foot,

21  what's to keep --

22          MR. COSTA:

23              Let me object because there's

24  no testimony that the tide --

25          MR. BEZOU:

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 51

```
 1                    That's not an objection.

 2            MR. COSTA:

 3                    Object to the form because

 4     you're assuming things that are not true.

 5            MR. BEZOU:

 6                    That's not an objection.

 7            MR. COSTA:

 8                    I'm going to tell her not to

 9     answer it then.

10            MR. BEZOU:

11                    That's fine if you tell her

12     not to answer --

13            MS. GENTRY:

14                    It's not going to move that

15     much.

16     EXAMINATION BY MR. BEZOU:

17     Q.    In your experience, what is the

18     greatest that you've observed the boat moving

19     up or down?

20     A.    I never really paid that much

21     attention.  It moves up and down a little bit

22     but it's not very much.

23     Q.    What do you mean by "not very much,"

24     how much is "not very much"?

25     A.    A few inches.
```

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 52

1    Q.    Did you ever measure it?

2    A.    No.

3    Q.    So you know it moves some up and down?

4    A.    Uh-huh (affirmative response).

5    Q.    But you don't know how much?

6    A.    No.  A little bit.

7    Q.    Do you know whether there were any

8    spring lines attached to the boat -- do you

9    know what a spring line is?

10   A.    Yes, lines from the boat crossways.

11   Q.    What's the purpose of the spring line?

12   A.    To keep the boat from moving directly

13   backwards and forwards.

14   Q.    Looking at this picture, D-1, can you

15   tell me if there's a spring line visible?

16   A.    I can't see --  That's one.

17   (INDICATING)

18   Q.    So you believe that the line coming

19   from the port side of the stern to a piling

20   located on the port side of the vessel flush

21   with the bulkhead is a spring line?

22   A.    I don't know.  One of them, I really

23   don't know, I don't do the mooring.

24   Q.    Sure.  This appears to be one of the

25   boat bumpers; is that correct? (INDICATING)

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 53

1    A.    Uh-huh (affirmative response).

2    Q.    And the same here, do you see that,

3    what appears to be another bumper hanging

4    down?  (INDICATING)  Do you recall that Albert

5    or David used two boat bumpers at the rear of

6    the boat?

7    A.    I would say they would, but I don't

8    remember; I don't recall it.

9    Q.    Looking at this picture and this other

10   picture, it looks like there's some space in

11   between the bumper and the concrete bulkhead,

12   do you recall how much space there was between

13   the bumpers and the bulkhead?

14   A.    What do you mean?

15   Q.    You see that shadow right there,

16   (INDICATING) I'm talking about the space

17   between this side of the bumper and the

18   bulkhead, do you recall how much space there

19   would have been?

20   A.    I suppose it would vary depending on

21   the tide, but it would only be a couple of

22   inches.

23   Q.    Do you remember on the day of the

24   accident --

25   A.    No.

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 54

```
 1    Q.    -- was the boat able to move forwards,
 2    backwards --
 3              MR. COSTA:
 4                   I object --
 5    EXAMINATION BY MR. BEZOU:
 6    Q.    -- once it was moored?
 7    A.    No, I don't -- no more than a couple of
 8    inches.
 9    Q.    Do you recall if it was able to move
10    side to side?
11    A.    No, because of the stern lines.  Again,
12    a couple of inches.
13    Q.    So if I, someone jumped on the back
14    corner, was it going to, would it wobble,
15    would it move at all or was it fairly taught?
16    A.    If someone jumped, I don't know.  I
17    imagine it would rock, I don't know.
18    Q.    Did you ever observe the boat rocking
19    either forward or aft or side to side when
20    someone was boarding the boat?
21    A.    No.  If someone comes on, you're aware
22    of the difference but not --
23    Q.    Tell me about the difference that you
24    were aware of when someone would walk the
25    plank and get on the boat, how would it move?
```

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 55

```
 1    A.    It wouldn't move until they stepped on

 2    the boat but not that much.  There was a lot

 3    of activity on the river.

 4    Q.    Tell me about that activity on the

 5    river --

 6    A.    We were close to the bridge and boats

 7    were coming up and down all the time so there

 8    was a lot of activity off the front bow of the

 9    boat.

10    Q.    Would those put out a wake of some

11    sort?  I know it's a "no wake zone" but --

12    A.    Yes, but I mean, there's boats going

13    around and around and there's a lot of

14    activity at that time, people arriving.

15    Q.    Would that other vessel activity cause

16    the boat to move even if only slightly?

17    A.    A little bit.

18    Q.    And so when someone would walk on this

19    plank, let's just take it while they're on the

20    plank in between the bulkhead and the back of

21    the boat, would the boat move at all as

22    they're standing, when they took that first

23    step onto the plank so now their weight is

24    being supported by the boat partially, would

25    the boat move?
```

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 56

```
1    A.    Not too particularly -- not really, not
2    more than it would move from any other boat
3    going by in front of it or, it's quite a lot
4    of activity going on, so it would move a
5    little bit but not more than an inch or so.
6    Q.    So when you say "activity," I
7    understood you to be talking about other
8    vessel activity in the water --
9    A.    Uh-huh (affirmative response).
10   Q.    Was there also activity on the boat
11   occurring in the front of the boat at times?
12   A.    It moved a little bit, yes, but not
13   that much.
14   Q.    You went to the Captain's Ball that
15   night, correct?
16   A.    Uh-huh (affirmative response).
17   Q.    Is that a yes?
18   A.    Yes.
19   Q.    Tell me about that.  What time did you
20   all leave the boat?
21   A.    I suppose about seven.  I don't
22   remember.
23   Q.    Had you had anything to drink at that
24   point?
25   A.    No.  I've pretty much quit.  I might
```

Deposition of Sadie Gentry                            Taken: 11/01/2021

Page 57

1   have had a soda, lime when I drank.

2   Q.    Why did you quit drinking at that

3   point?

4   A.    It does not work very well with my

5   Parkinson's.

6   Q.    So what happens to you if you -- in

7   2018 at the time of this boat festival, if you

8   were to drink, what would the negative impact

9   be on your Parkinson's?

10  A.    I wouldn't feel good.

11  Q.    Would it cause you to be unsteady?

12  A.    I suppose.

13  Q.    Were you taking medication that would

14  interact with alcohol in a way that you didn't

15  like?

16  A.    I need to take my meds --

17          MR. COSTA:

18              You need to take your meds

19  now?

20          MR. BEZOU:

21              If at any point you need to

22  take a break, just say so.

23          MS. GENTRY:

24              I need to take my meds.

25          (A SHORT BREAK WAS TAKEN)

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 58

1     EXAMINATION BY MR. BEZOU:

2     Q.    Were you on any medication in October

3     of 2018?

4     A.    Yes.

5     Q.    Did any of the medication you were on

6     in October of 2018 interact unfavorably for

7     you with alcohol?

8     A.    I pretty much don't drink at all; I get

9     a glass and I hold it.

10    Q.    Would you all have walked from the boat

11    to the party?

12    A.    No.  There's a shuttle and the shuttle

13    goes to the end of the road, about 30 yards.

14    Q.    Who did you leave the boat with to go?

15    A.    David.

16    Q.    Was Albert there?

17    A.    I don't think so.

18    Q.    Did Albert go to the party at all that

19    night?

20    A.    I can't remember.  I know he's been to

21    some of them, but I don't remember if he went

22    to that one or he went home, did his sitter

23    come get him or was that the year before, I

24    can't remember.

25    Q.    Do you know if David had anything to

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 59

1    drink before you all went to the ball?

2    A.    I'm sure David would have had a

3    cocktail.

4    Q.    At the ball, was there food?

5    A.    Food.

6    Q.    Music?

7    A.    Yes.

8    Q.    Was there a bar?

9    A.    Yes, but different bars all over the

10   place.

11   Q.    I'm just talking about at the Captain's

12   Ball, was there a --

13   A.    You'd get wine one place, beer from one

14   place, different places.

15   Q.    Was it an open bar or cash bar?

16   A.    Cash bar, I think.  I know I always

17   have cash for tips but I can't remember if it

18   was a cash bar.  I think it's a cash bar.

19   Q.    A question for you since you weren't

20   drinking then, why would you have cash for the

21   bar?

22   A.    To leave tips.  They expect you to.

23   Q.    Do you know what time you got there?

24   A.    No, I really do not.

25   Q.    It wouldn't have taken very long on the

Deposition of Sadie Gentry                           Taken: 11/01/2021

Page 60

1   shuttle?

2   A.    No, just a few minutes on the shuttle.

3   And I think for some reason there was a long

4   line to get in; a long chatty line since you

5   know a lot of people.

6   Q.    Did you all have a good time that

7   night?

8   A.    Yes.  I think David has more fun.

9   Q.    It's more his crowd?

10  A.    More his crowd.

11  Q.    Do you recall if you ate anything that

12  night?

13  A.    Yes. I know I stood in two lines. And

14  then David wanted something else, we went and

15  got something else, stood in another line.

16  Q.    Do you remember what that was?

17  A.    No, but the food is fairly, it's pretty

18  good but it's fairly ordinary; it's not a big

19  deal.

20  Q.    It wasn't Commander's Palace?

21  A.    No.  It wasn't the price either.

22  Q.    Do you know if David ate?  You said he

23  stood in line with you, did he --

24  A.    He sat and I went and got different

25  food.

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 61

1    Q.    Did you bring him back food though?

2    A.    I brought him food back to the table.

3    Q.    Do you know, did you see David drink

4    anything at the ball?

5    A.    I'm sure he had a scotch I would think.

6    Q.    You said scotch?

7    A.    Yes.

8    Q.    How many?

9    A.    I have no idea.  Not many because it

10   was a long line.  It's not a really big

11   drinking deal.

12   Q.    We're in Southeast Louisiana, I assume

13   that everything is a big drinking deal.

14   A.    It really isn't.  There's plenty of it

15   around if you want to spend the money but --

16   Q.    So David had a cocktail before you all

17   went to the bar, you believe he had at least

18   one scotch at the ball, anything else?

19   A.    I don't know.

20   Q.    It's possible?

21   A.    It's possible he had a glass of wine.

22   Q.    Do you know how long y'all were there?

23   A.    No.  A couple of hours.

24   Q.    So what time do you think roughly you

25   left?

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 62

1    A.    I really don't remember, but it

2    wouldn't be late.

3    Q.    Before midnight?

4    A.    Oh, yeah.

5    Q.    And so to get back to the boat, I

6    assume you took the shuttle?

7    A.    Yes, and then I think the shuttle went

8    back -- one time the shuttle went and dropped

9    us off somewhere else and we had to walk back.

10   Q.    To get in the shuttle leaving the

11   Captain's Ball, was there a queue of some

12   sort?

13   A.    Uh-huh (affirmative response).

14   Q.    Do you recall waiting in that que?

15   A.    Yep.

16   Q.    That's Ms. Darby, (INDICATING) do you

17   recall encountering Ms. Darby during the

18   Captain's Ball?

19   A.    No.

20   Q.    There's been testimony in this case

21   that Mr. Snow and Ms. Darby talked at the

22   Captain's Ball and that you came up upon that

23   and joined the conversation, you don't have

24   any recollection of that?

25   A.    No.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 63

1    Q.    Other than just a moment ago and when

2    you saw Ms. Darby get pulled out of the water

3    by those two gentlemen, had you ever seen her

4    before?

5    A.    Not to my knowledge.  David knew people

6    at the festival more than I did.

7    Q.    Is it possible that you did speak to

8    Ms. Darby along with David at the Captain's

9    Ball and just can't recall?

10   A.    It's possible.

11   Q.    Do you ever refer to the BIRD OF TIME

12   as "our boat" --

13   A.    No.

14   Q.    -- talking to other people?

15   A.    I could have said "our boat" meaning

16   the boat I came off depending on who I was --

17   Q.    Has David Snow ever referred to you as

18   his wife?

19   A.    Yes, and I always tell him off.

20   Q.    Is that just wishful thinking on his

21   part?

22   A.    No, he's just old-fashioned.

23   Q.    So the first time you recall ever

24   meeting Judy Darby is when?

25   A.    Well, I suppose closer to the time the

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 64

1    boat incident, I remembered meeting her then,

2    but I don't remember -- that's why I didn't

3    recognize her there.

4    Q.    As you sit here today though as best

5    you can remember, what's the first time you've

6    laid eyes on her?

7    A.    When she got fished out of the water.

8    I don't remember seeing her when she said she

9    talked to David.

10   Q.    And so the first time you recall seeing

11   her is the day of the incident?

12   A.    Uh-huh (affirmative response).

13   Q.    I want to go through that with you.

14   Where were you physically the first moment you

15   can recall ever seeing Ms. Darby?

16   A.    I was in the back of the boat, not

17   right at the stern but in the back, one of the

18   bench seats on the side.

19   Q.    When would that have been?

20   A.    I don't remember the time.

21   Q.    Could it have been -- if I represent to

22   you that it would have been the Saturday

23   following the Captain's Ball, does that sound

24   right?

25   A.    Yes.  It was when she fell in the water.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 65

1    Q.    And so you're on the back of the boat
2    on a bench seat on the side, were you sitting
3    or standing?
4    A.    Sitting, I would think.
5    Q.    And you were looking which direction?
6    A.    I'd be looking downriver pretty much.
7    Q.    So if you're looking downriver, the
8    plank would be to your right, the shore would
9    be to your right?
10   A.    Right.
11   Q.    And so tell me when's the moment you
12   first noticed Ms. Darby?
13   A.    I don't remember noticing her until she
14   splashed into the water.
15   Q.    So the splash is first thing you
16   remember?
17   A.    That's all I remember.  People have
18   talked about it so much, you think you see --
19   I can imagine her standing on the edge of the
20   plank.
21   Q.    But you didn't see her walk the plank?
22   A.    I didn't see her.
23   Q.    When you heard the splash, who else was
24   on the boat?
25   A.    David, Heidi, Albert.  I'm not sure

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 66

1   Albert was there.

2   Q.    Earlier you testified that this may or

3   may not have been the year Heidi came to the

4   festival?

5   A.    No.  She definitely came, she was on

6   the boat, but I don't know if she came over

7   with it.

8   Q.    Rode with you from Slidell to

9   Madisonville?

10  A.    Yes.

11  Q.    Thank you for clearing that up.

12  A.    She was definitely there.

13  Q.    Were you on the starboard side of the

14  boat or the port side --

15  A.    I'd be --

16  Q.    -- when you heard the splash, and

17  you're sitting on that bench --

18  A.    I'm on the opposite side of the

19  gangplank.

20  Q.    So you would be on the upriver side,

21  the port side looking --

22  A.    Port side looking out.

23  Q.    Looking across the boat?

24  A.    Yes.

25  Q.    Downriver?

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 67

1    A.    Yes.

2    Q.    Where was David?

3    A.    I don't know, he may have been -- I

4    really do not know where he was.

5    Q.    What about Heidi?

6    A.    She was in the cockpit somewhere.

7    Q.    And so the cockpit, is that where you

8    -- when you testified earlier about the

9    docking and that you didn't see the docking

10   because you were down --

11   A.    I was probably tidying up otherwise, if

12   I came up, I'd be on my seat on that side.

13   Q.    When you say that Heidi was in the

14   cockpit, was that the same spot that you would

15   have been --

16   A.    I think she was on the other side.

17   Q.    Is the cockpit lower than the rest of

18   the boat?

19   A.    Yes.

20   Q.    So if you're in the cockpit looking

21   back to the stern, can you see over the back

22   of that bench?

23   A.    Yes.

24   Q.    Could you see the concrete?

25   A.    Yes.

Deposition of Sadie Gentry                                      Taken: 11/01/2021

Page 68

1   Q.    Can you see the corrugated metal that

2   runs up the face; do you recall that?

3   A.    Corrugated metal?

4   Q.    Do you recall any metal sheeting that

5   runs across the face of the bulkhead?

6   A.    I don't recall that.

7   Q.    How far down on the bulkhead from the

8   top concrete, water's down here, (INDICATING)

9   how far down could you see if you're standing

10  down in the cockpit looking back across the

11  stern of the boat?

12  A.    I don't understand your question.

13  Q.    Let me try to help you out.  Looking at

14  D-1, show me where the cockpit is that you're

15  talking about.

16  A.    (WITNESS COMPLIES INDICATING)

17  Q.    When you said you --

18  A.    That's where I was sitting.

19  (INDICATING)

20  Q.    In here is the cabin area that you

21  could go; is correct?

22  A.    Down through here. (INDICATING)

23  Q.    Let me get a better picture.  Here we

24  go.  That's a better picture, I think.

25  A.    It's me, Calvin, David -- (INDICATING)

Deposition of Sadie Gentry                     Taken: 11/01/2021

Page 69

1    Q.    Who's the other person?

2    A.    David, Calvin and I think that's me.

3    Q.    Where's Heidi?

4    A.    She would have been down here

5    (INDICATING) somewhere or may have popped

6    onshore somewhere.

7    Q.    Or maybe she was taking the picture?

8    A.    Oh, she would be taking the picture,

9    yes.

10   Q.    And so when you said you were down in

11   the cockpit in the cabin when they were

12   docking the boat, where would you have been?

13   A.    I was --

14   Q.    Would you have been up in here

15   somewhere? (INDICATING)

16   A.    Staying out of the way.  I would have

17   been back here probably. (INDICATING)

18   Q.    Okay.

19   A.    But it was difficult, so I'd get back

20   out of the way.

21   Q.    I'm going to have you -- in this

22   picture, when you -- you were sitting where

23   Mr. Snow is depicted here when you heard the

24   splash? (INDICATING)

25   A.    Yes.

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 70

1    Q.    Where was he located when you heard the

2    splash?

3    A.    I have no idea.

4    Q.    Where was Heidi located in this

5    picture?

6    A.    Back around here.  We both managed to

7    --

8    Q.    Can you draw a circle and put an "X" in

9    here where you believe Heidi is located?

10   A.    I really -- I don't know where Heidi

11   was.  She got back to the back of the boat

12   same time as I did.

13   Q.    Do you know in which direction Heidi

14   was looking --

15   A.    No.

16   Q.    -- before the splash?

17   A.    No, I'm not sure where she was.

18   Q.    What about Calvin, where was he

19   located?

20   A.    I don't know.

21   Q.    So if I understand correctly, you know

22   where you were and you know you didn't see the

23   fall, right?

24   A.    I heard the splash.

25   Q.    And you don't know where the other

Deposition of Sadie Gentry                         Taken: 11/01/2021

Page 71

```
 1    three individuals were or whether they saw the
 2    fall; is that an accurate statement?
 3    A.    I think so.  You hear so many stories
 4    about what people saw.
 5    Q.    Tell me about that.  Who's told you
 6    what about how, about what happened? I know we
 7    talked about David earlier, but have you
 8    discussed this with Heidi?
 9    A.    Not really, no, because she and I both
10    hung off the back of the boat and Heidi held
11    on the lines and Heidi grabbed the camera.
12    Q.    I'm talking after the incident, after
13    everybody's fished out of the river and
14    there's no immediate danger of anybody
15    drowning.  Have you and Heidi had any
16    conversations about this incident in the three
17    years since it occurred?
18    A.    Not much until recently because it was
19    over.
20    Q.    Tell me about that.
21    A.    How do you mean, tell you what?
22    Q.    The conversation that you had with
23    Heidi?
24    A.    Well, obviously we talked about it
25    since all this.  I don't think we discussed
```

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 72

1    where she was when it happened.

2    Q.    So you didn't discuss with Heidi what

3    Ms. Darby was or wasn't doing before she fell

4    in the water?

5    A.    Apparently she was taking pictures.

6    Q.    You say "apparently," why do you

7    believe that?

8    A.    That was apparently what she was

9    claiming to be doing.

10   Q.    You didn't see her take a picture, did

11   you?

12   A.    No.

13   Q.    Did you see her with a camera raised?

14   A.    Not really, but I've heard so many

15   times that she had.  I don't actually remember

16   seeing --

17   Q.    I'm only interested today in what you

18   specifically personally witnessed or what you

19   have personally said to other people or heard

20   from other people, and if it's information

21   that you've heard from other people, I need

22   you to identify for me, please, who told you,

23   when, and some context if you can.  So why do

24   you believe that she was attempting to take a

25   picture?

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 73

1    A.    Because that's what she came to do and

2    she had a camera.

3    Q.    Why do you believe that she came to

4    take pictures that day?

5    A.    Because since then, they were tourists

6    -- this has come up in discussions with David

7    that she was supposed to be taking a picture.

8    Q.    And you say that came from David?

9    A.    Uh-huh (affirmative response).

10   Q.    Yes?

11   A.    Yes.

12   Q.    Has Heidi told you that she was taking

13   a picture or attempting to take a picture?

14   A.    I don't think Heidi had specifically

15   but Heidi may have seen it.  I don't know what

16   stage of the actions Heidi saw.

17   Q.    So you don't know if she witnessed

18   Ms. Darby approach the boat?

19   A.    I don't know.

20   Q.    You don't know if Heidi was even aware

21   of Ms. Darby's presence until the splash?

22   A.    That's all I was; I don't know whether

23   Heidi saw her.

24   Q.    Same thing for Calvin, you don't know

25   if Calvin --

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 74

1    A.    I'm not sure where Calvin was, he may

2    have been forward on the boat and had his back

3    turned --

4    Q.    Has either Heidi or Calvin ever told

5    you, I saw Ms. Darby approach the boat?

6    A.    No.

7    Q.    Has either Heidi or Calvin told you, I

8    saw Ms. Darby with a camera raised?

9    A.    No.

10   Q.    Tell me about the plank after the

11   splash, what do you recall?

12   A.    We walked across it to get back to

13   shore and Heidi checked out Ms. Darby and sat

14   her on, there was a bench somewhere close --

15   it wasn't that close.

16   Q.    Did the plank have to get fished out of

17   the water?

18   A.    No, the plank didn't fall; it would

19   have killed someone.

20   Q.    If Ms. Darby testified that the plank

21   went into the water with her and caused a gash

22   on her shin, you would dispute that?

23   A.    Absolutely, because Heidi looked her

24   over, not a proper examination, but I saw her

25   standing up and Heidi was checking her over.

Deposition of Sadie Gentry                           Taken: 11/01/2021

Page 75

1    Q.    Did Heidi have her disrobe?

2    A.    No, but there was no blood or anything.

3    Q.    So without having Ms. Darby disrobe,

4    you have no way of knowing whether Heidi

5    conducted a thorough physical examination of

6    Ms. Darby --

7    A.    No, she didn't; she just checked it

8    out.   She was dripping wet but she wasn't

9    dripping blood.

10   Q.    And you know that how?

11   A.    She said so.

12   Q.    So Heidi told you that?

13   A.    Yes.

14   Q.    Heidi would have reported back to you?

15   A.    If she was hurt or something.

16   Q.    So you don't believe Ms. Darby was

17   injured?

18   A.    I don't believe Ms. Darby was injured.

19   Apparently she had a scrape on her leg.

20   Q.    Are you aware that she had a torn

21   meniscus in her knee that required surgery?

22   A.    Yes, but that happened after.

23   Q.    Why do you say that happened after?

24   A.    That was based on the date on the

25   information.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 76

1    Q.    Tell me what information.

2    A.    Whatever it was.  Apparently there was

3    some medical paperwork or something.

4    Q.    And so you have reviewed Ms. Darby's

5    medical records that have been produced in

6    this case?

7    A.    I haven't sat and looked at it; it was

8    discussed a bit.

9    Q.    With whom?

10   A.    After the accident, Heidi said she was

11   okay except that she had a scrape on her leg.

12   Q.    Heidi didn't treat her as a physician,

13   did she?

14   A.    Un-un (Negative Response).

15   Q.    No?

16   A.    She checked her out.

17   Q.    Because if Heidi had been her treating

18   physician and was talking to you about her

19   medical condition, that would be a problem,

20   right?

21   A.    Right.

22   Q.    Because we have HIPAA laws and other

23   things to protect the privacy of individuals,

24   right?  So it sounds to me and correct me if

25   I'm wrong, but Heidi checked her out just as a

Page 77

1    bystander --

2    A.    Yes.

3    Q.    -- and said, no broken bones sticking

4    through your skin --

5    A.    Yes.

6    Q.    -- okay, on your way, right?

7    A.    Her partner arrived and they walked

8    home.  And a little later, the partner called

9    David and said she was sitting at home with a

10   cocktail and she was fine.

11   Q.    Do you know if her partner is a medical

12   doctor?

13   A.    I'm sure he's not, but I don't know,

14   no.

15   Q.    I believe we talked a moment ago about

16   you had seen some medical documents that lead

17   you to believe that this injury --

18   A.    I haven't seen the medical documents,

19   I've seen notes.

20   Q.    Can you describe for me what the

21   information is that you reviewed that leads

22   you to believe that that injury occurred at a

23   later time and date?

24   A.    (NO RESPONSE).

25             MR. COSTA:

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 78

1                        It may be attorney/client

2       privilege for her to answer that but --

3                  MR. BEZOU:

4                        Is it or is it not?

5                  MR. COSTA:

6                        It may be, where she heard it

7       from was me.

8                  MR. BARNETT:

9                        That's not a privilege.

10                 MR. COSTA:

11                       That's where she heard it

12      from.

13      EXAMINATION BY MR. BEZOU:

14      Q.    So if Ms. Darby's treating physicians

15      testified that this injury was caused on this

16      date by this thing, you don't have any reason

17      other than what your lawyer may or may not

18      have told you to dispute that?

19      A.    She walked home, and according to her

20      partner, was sitting at home having a

21      cocktail.

22      Q.    Have you ever known of anybody to

23      suffer an injury and it not be immediately

24      apparent the full extent of that injury?

25      A.    Depending on the injury.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 79

1    Q.    Absolutely.

2    A.    I mean, you can't break something and

3    then walk home.

4    Q.    Do you know what a meniscus is?

5    A.    Yes.

6    Q.    Do you know what an ACL is?

7    A.    Sort of.

8    Q.    You are aware though that there are

9    injuries that you could suffer to your lower

10   extremities yet still be able to walk home,

11   right?

12   A.    I suppose you can, yes.

13   Q.    On the morning of the fall, the

14   incident, how much -- had you had anything to

15   drink that morning?

16   A.    Un-un (Negative Response) -- coffee.

17   Q.    What about David?

18   A.    Coffee.

19   Q.    What about Heidi?

20   A.    Coffee.

21   Q.    What about Calvin?

22   A.    Coffee.

23   Q.    So if I show you this picture, again

24   this is "Rice 000001," do you see David

25   sitting there?  (INDICATING)  You may need

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 80

1   your glasses.  Do you see that bottle right

2   there. (INDICATING)

3   A.    (NO RESPONSE)

4   Q.    I've got a better photo here.  You see

5   that beer bottle there that's on "Rice 4"?

6   A.    Uh-huh (affirmative response).  What

7   time of day was this?

8   Q.    I can't answer questions for you.  But

9   you see that's a beer bottle there?

10  (INDICATING)

11  A.    Uh-huh (affirmative response).

12  Q.    And do you -- what is that next to it?

13  A.    A tissue.

14  Q.    Could it be a glass with a napkin

15  wrapped around it?

16  A.    I would think a little piece of

17  something to eat.

18  Q.    So if this picture shows a beer that's

19  mostly been consumed at that point, would that

20  tell you this picture's not from the morning

21  of the incident?

22  A.    Yes.  David would not be drinking in

23  the morning.

24  Q.    Let me ask you this, are you in this

25  picture anywhere?

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 81

```
 1    A.    Is that me? (INDICATING)

 2    Q.    I believe that's you but --

 3    A.    Yes.

 4    Q.    What's in that glass right in front of

 5    you?

 6    A.    If it was me, it would be soda.

 7              MR. COSTA:

 8                  Which glass are you talking

 9    about?

10              MR. BEZOU:

11                  Either one, does she know

12    what --

13              MS. GENTRY:

14                  In the plastic --

15    EXAMINATION BY MR. BEZOU:

16    Q.    Could it be coffee?

17    A.    No, it wasn't coffee, but none of us

18    would have had an alcoholic cocktail in a

19    plastic glass.

20    Q.    If you were drinking an alcoholic

21    cocktail, it would be in a glass?

22    A.    Yes.

23    Q.    Even on a boat?

24    A.    Yes.

25    Q.    Do you know what time of day this
```

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 82

1    happened?

2    A.    I really don't remember, it had to be

3    -- I really don't -- late morning perhaps.

4    Q.    If it was early afternoon, does that

5    change your thoughts on whether or not --

6    A.    Is this when it happened, is that when

7    the photo was taken at the time?

8    Q.    If, assume for me this was -- the

9    incident happened at 3:00 in the afternoon,

10   does that change your answer about Heidi,

11   David and Calvin just having coffee?

12   A.    No, that would be a beer for David, he

13   wouldn't be drinking coffee at that point.

14   Q.    So if it's beer time for David, what's

15   in your cup more than likely at that point,

16   are you having a cocktail?

17   A.    No.

18   Q.    What about Heidi?

19   A.    I doubt it.

20   Q.    What about Calvin?

21   A.    He might have a beer.

22   Q.    I think you testified earlier that you

23   leaned over into the water and was holding on

24   to Ms. Darby after she fell?

25   A.    Yes.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 83

1    Q.    And Heidi also?

2    A.    Heidi held her hand to get the camera.

3    Q.    Because y'all weren't strong enough to

4    pull her in the boat?

5    A.    Right, keeping her up but couldn't pull

6    her up.

7    Q.    Before that, and I think I know the

8    answer to this because you didn't see her, but

9    did you jester to Ms. Darby in any way while

10   she was on the bank, you never saw her while

11   she was on the bank; is that your testimony?

12   A.    I don't remember seeing her, I have

13   pictures in my mind from -- but I don't

14   remember seeing her.

15   Q.    Do you recall what she was wearing that

16   day?

17   A.    A dark dress, it came below her knees I

18   think. I remember seeing her standing outside

19   on the dock dripping.

20   Q.    Almost any dress comes out of the

21   Tchefuncte River dark so -- a dress?

22   A.    It was a dark color.

23   Q.    You said it came below the knee?

24   A.    I think it came to or below the knee.

25   Q.    Do you know, what was David's policy

Alliance Court Reporters, LLC
(504) 488-6624  alldepo@bellsouth.net

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 84

1    about letting people on the boat while at the

2    festival?

3    A.    Anybody could come on the boat but they

4    have to ask, and that seems to be the policy

5    of everybody at the festival.

6    Q.    It's a requirement, right?

7    A.    You have to ask, but when we'd have

8    five year-old kids coming on the boat on their

9    own, they would ask and their parents would

10   come and train them to ask politely.

11   Q.    Because you believe it's important to

12   follow the rules of the festival?

13   A.    In that context, yes.

14   Q.    Why?

15   A.    You can't have too many people coming

16   on the boat.  I mean, some of the boats are

17   very very beautiful and if a hundred people

18   got on the boat, it would be miserable.

19   Q.    So you wouldn't want to damage the

20   boat, that's one reason; are there any other

21   reasons why it's important to follow the rules

22   and requirements of the festival?

23   A.    They might fall off.

24   Q.    Might fall off is another reason?

25   A.    You have to keep track of who's on the

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 85

1    boat.

2    Q.    Other than requiring festival goers to

3    ask permission to come on the boats at the

4    festival, are you aware of any other

5    requirements that the festival imposed on

6    either the festival goers or the participants?

7    A.    No.  Like what?

8    Q.    I'm just asking if you know of any?  Do

9    they have to be registered, do they have to

10   fly a certain flag, anything?

11   A.    The requirements of the festival had of

12   the boat owners or --

13   Q.    Or of the patrons at the festival?  I

14   believe you said to ask before you come on

15   board is one of them?

16   A.    Uh-huh (affirmative response).

17   Q.    I'm just wondering if you know of any

18   others?  Did they require for example a sign

19   to be put up by each vessel telling the

20   patrons they needed to ask permission to come

21   on board, do you recall if that was one of the

22   requirements?

23   A.    I think every boat had a sign.

24   Q.    Including the BIRD OF TIME, correct?

25   A.    I think so.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 86

1   Q.    Can you show me on that picture where

2   that sign would be?

3   A.    That's a terrible picture.

4   Q.    Speak to your daughter about that.

5   A.    It would usually be -- I cannot --

6   Q.    You want a better picture.  I'm looking

7   for one that would give you the best angle.  I

8   think you're looking at it there. All these

9   wouldn't be useful until you're on the boat.

10  A.    It would be up in here.  (INDICATING)

11  Because this is the rear, it would be up

12  underneath -- I think in this case, it would

13  be attached at the rear, we would put it on

14  the back of the cabin which --

15  Q.    So can you circle it for me on "Rice

16  1"?

17  A.    I see where it might have been.

18  Q.    Make a big circle so I could see it.

19  A.    Let me see if I have the right place.

20  I think we had to put it under there

21  (INDICATING) and it wasn't really --

22  Q.    Try to write it now.

23  A.    (WITNESS COMPLIES)

24  Q.    Why don't you draw a line to it so we

25  can see it?

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 87

1    A.    (WITNESS COMPLIES)

2    Q.    Perfect.

3    A.    I think on that boat, it couldn't be on

4    the --

5    Q.    What you've indicated on "Rice 1" -- we

6    will attach this, this is the location where

7    you believe the sign telling festival goers

8    that they needed to ask permission to get on

9    the boat would be located?

10   A.    Yes, but there's signs as you walk into

11   the festival everywhere.

12   Q.    I'm just asking about the sign specific

13   to BIRD OF TIME though?

14   A.    Uh-huh (affirmative response).

15   Q.    And correct me if I'm wrong -- how big

16   were these signs?

17   A.    (INDICATING)

18   Q.    The size of a legal pad of paper?

19   A.    Yes.

20   Q.    Because I don't see the sign in this

21   picture where you've indicated.

22   A.    I don't see it either.

23   Q.    Is it possible that Mr. Snow didn't put

24   it up?

25            MR. COSTA:

Deposition of Sadie Gentry                      Taken: 11/01/2021

Page 88

1                    It's also possible that --

2              MR. BEZOU:

3                    Please don't testify.

4              MR. COSTA:

5                    You're assuming things that

6      are not in evidence why that sign was not

7      there.

8              MR. BEZOU:

9                    That's not my job.

10     EXAMINATION BY MR. BEZOU:

11     Q.    If you see it in another location,

12     please point it out to me, and if you know a

13     reason why it wouldn't be displayed in this

14     photograph, please enlighten me, it's not a

15     trick --

16     A.    No.  I can't see it.

17              MR. COSTA:

18                    If you can't see it, you can't

19     see it.

20     EXAMINATION BY MR. BEZOU:

21     Q.    But based on your memory, the --

22     A.    I think there was some reason we

23     couldn't attach it at the actual stern because

24     it wouldn't -- David had to get a copy or

25     something or punch holes in it, he had to --

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 89

1    Q.    Do you know why you would want to put

2    it at the stern instead of up in the boat?

3    A.    If you put it at the stern, it's more

4    visible for people coming by.

5    Q.    So to the best of your memory, that

6    sign is posted somewhere on the vessel, we

7    just can't see it in this picture?

8    A.    Yes.

9              MR. BEZOU:

10                  I want it "Rice 1" for ease at

11   trial.

12             MS. GENTRY:

13                  The festival people are coming

14   by all the time, you have to have it visible

15   somewhere.

16   EXAMINATION BY MR. BEZOU:

17   Q.    Do you know if the festival people, are

18   they paid or are they volunteers?

19   A.    I don't know.

20   Q.    There's a lot of people that come to

21   this festival?

22   A.    Yes.

23   Q.    It's crowded, if I remember correctly,

24   it's been a few years?

25   A.    Not necessarily.

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 90

1   Q.    But on the street?

2   A.    Yes.

3   Q.    I think you testified that David would

4   let anybody who wanted to come on board the

5   boat, come on board the boat?

6   A.    Uh-huh (affirmative response).

7   Q.    How many people came onboard during the

8   2018 Festival while you were there?

9   A.    I wasn't keeping count.

10  Q.    Five, five hundred, can you give me an

11  estimate?

12  A.    Certainly not 500, more than 5 -- 20.

13  Q.    Do you recall each of them -- did you

14  know them all?

15  A.    No.

16  Q.    Did you witness each of those persons

17  ask for and receive explicit permission to

18  board?

19  A.    Yes.

20  Q.    From whom, was that from David or from

21  you or some combination depending on who was

22  closest to the plank, how did that work?

23  A.    David if he wasn't in the cockpit.

24  Q.    If David wasn't where he could see

25  somebody wanting to come onboard, did you ever

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 91

1    say, yeah, come onboard to anybody, tell them

2    --

3    A.    No.  I'd tell them to wait for David.

4    Q.    What about Albert, would he ever wave

5    people onboard?

6    A.    Albert wouldn't spend a whole lot of

7    time onboard.  Yes, if he was onboard, if it

8    was somebody he knew, he might.

9    Q.    Have you ever invited anybody onboard

10   the boat?

11   A.    No.

12   Q.    And I don't mean just physically at the

13   plank, have you ever in conversation with

14   someone say at the Captain's Ball or

15   otherwise, say, come to our boat?

16   A.    No.  Only two or three friends live in

17   Mandeville who I see in New Orleans, I say,

18   we'll be at the festival, stop by and see us.

19   Q.    My understanding is, it's your

20   testimony because you didn't see Ms. Darby

21   approach the boat, correct?

22   A.    Uh-huh (affirmative response).

23   Q.    And you just heard the splash, you

24   don't know one way or the other whether Mr.

25   Snow gave her permission to board the boat

Page 92

1    that day, do you?

2    A.    I understood that he had; from talking

3    later, he said she was going to come.

4    Q.    So it's your understanding that Ms.

5    Darby had been invited on the boat by the

6    owner, Mr. Snow?

7    A.    Uh-huh (affirmative response).

8    Q.    Is that a yes?

9    A.    Yes.

10            (A SHORT BREAK WAS TAKEN)

11   EXAMINATION BY MR. BEZOU:

12   Q.    Ms. Gentry, your counsel represented to

13   me that you're getting tired, I want you to

14   know I'm going to try to move this as quickly

15   as possible to get done as soon as possible.

16   If you get too tired to continue, please just

17   say so, and we can do this again another day,

18   but I really just want to get this over with

19   for you now if we can.

20            MR. COSTA:

21               Thank you for that.

22   EXAMINATION BY MR. BEZOU:

23   Q.    Can you describe the two individuals

24   that you saw help Ms. Darby out of the water?

25   A.    Me and Heidi?  Or the two guys?

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 93

1    Q.    Yes, ma'am.

2    A.    Young, large.

3    Q.    White, black?

4    A.    White.  Shorts, white shirts, blondish.

5    Q.    You ever seen them before or since?

6    A.    Only to say hello as they went by.

7    Q.    Did you ever speak with them about

8    whether they saw her fall?

9    A.    No.

10   Q.    I think I asked you if you discussed

11   with Heidi whether she saw -- maybe I haven't

12   asked you this, I don't know.  Did you ever

13   talk to Heidi about whether she saw the fall?

14   A.    Never.

15   Q.    What about Calvin?

16   A.    No.

17   Q.    What is David G. Snow & Sadie Gentry,

18   LLC?

19   A.    No idea.

20   Q.    You're unfamiliar with that entity?

21   A.    LLC?

22   Q.    The LLC called David G. Snow & Sadie

23   Gentry, it's located at 125 North Genoa

24   Street?

25   A.    No idea, never heard of it.  What is

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 94

1    it?

2    Q.    It appears to me to be a Limited

3    Liability Corporation that the name is "David

4    G. Snow & Sadie Gentry, LLC," located at 125

5    North Genoa Street, I'm asking you if you have

6    any idea what that is?

7    A.    No.

8    Q.    Is it possible that Mr. Snow started an

9    LLC with your name in it and didn't tell you?

10   A.    I don't think so.

11   Q.    Do you know what Genoa Street property

12   that LLC is?

13   A.    No.

14   Q.    Are you familiar with Greg Marsiglia?

15   A.    Yes.

16   Q.    How do you know him?

17   A.    He's my attorney for personal stuff,

18   for wills and that kind of thing.  Greg's

19   father was my attorney and when he died, Greg

20   inherited us.

21   Q.    How long has Greg been your attorney?

22   A.    Since his father died, a year or two

23   years maybe; not very long.

24   Q.    So it's been a couple of years that

25   Greg has been your attorney?

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 95

```
 1    A.    Yes.

 2    Q.    What was his father's name; do you

 3    remember?

 4    A.    Um -- it will come.

 5    Q.    Do you know a woman named Patricia

 6    Lanning?

 7    A.    Lanning?

 8    Q.    L-A-N-N-I-N-G?

 9    A.    No.

10    Q.    What about Theresa Leslie Lanning Snow?

11    A.    No.

12    Q.    Debra Snow?

13    A.    No.

14    Q.    Jennifer Chapman?

15    A.    Yes.

16    Q.    Who is Jennifer?

17    A.    An old friend.

18    Q.    Is it your friend or David's friend?

19    A.    She was David's ex-girlfriend at one

20    point.

21    Q.    Who is John Highman?

22    A.    He's a friend.

23    Q.    Was he a real estate partner with you

24    at some point?

25    A.    We owned some real estate.
```

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 96

1    Q.    Did y'all ever live together?

2    A.    Uh-huh (affirmative response).

3    Q.    That would be at 910 Marigny or 920

4    Marigny?

5    A.    It was a long time ago, in the '70s.  I

6    can't remember.

7    Q.    Do you know if David Snow has a

8    homestead exemption anywhere?

9    A.    I'm not sure I know what a homestead

10   exemption is.

11   Q.    You have a homestead exemption, it's my

12   understanding, for the property you own at

13   2421 Royal meaning, that's your principal

14   place of residence and you get some tax break;

15   do you know if David has a homestead exemption

16   anywhere?

17   A.    I don't know.

18   Q.    Did you know that Mr. Snow didn't have

19   insurance on that boat?

20   A.    No.

21   Q.    Did you know that Mr. Snow told the

22   festival that the boat did have insurance?

23   A.    No.

24   Q.    Do you know that that was a requirement

25   to show a boat at the Madisonville Wooden Boat

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 97

1    Festival, that you had to be insured?

2    A.    No.

3    Q.    You don't know one way or another?

4    A.    No.

5    Q.    Do you know why David would have lied

6    to the festival about having insurance?

7    A.    No.

8    Q.    You all never discussed that?

9    A.    No.  It was David's boat.

10   Q.    My understanding is Albert Decourt was

11   a friend of his who helped him out with

12   maintenance and stuff on the boat sometimes?

13   A.    Uh-huh (affirmative response).

14   Q.    Is that correct?

15   A.    (NODS HEAD AFFIRMATIVELY)

16   Q.    But he didn't own the boat with David

17   Snow, correct?

18   A.    They had an agreement of some sort.

19   Q.    Are you aware that in this case, David

20   has testified that he is the sole owner of the

21   boat, that Albert owned none of the boat, are

22   you aware of that?

23   A.    I didn't know any of that but that's --

24   Q.    Are you aware that David listed Albert

25   Decourt as a co-owner of the boat with the

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 98

```
1    boat festival; do you know anything about
2    that?
3    A.    (SHAKES HEAD NEGATIVELY)
4    Q.    No?  Do you know Rob Castabond?
5    {Spelled phonetically}
6    A.    I don't know him; I've heard of him.  I
7    think I met him once.
8    Q.    This is "Rice 2," the stern of the
9    boat, the plank, was the plank ever located at
10   any other spots along here? (INDICATING)
11   A.    No.  It's pretty heavy.
12   Q.    Even at the 2017 Boat Festival or at
13   any other time, did they ever put it anywhere
14   else or it's always on the starboard side of
15   the boat?
16   A.    As far as I can remember, it was always
17   there, I'm not sure why there particularly but
18   --
19   Q.    Did you spend the night on the boat?
20   A.    Yes.
21   Q.    What nights?
22   A.    Friday night and Saturday night.
23   Q.    What about Sunday night?
24   A.    We were gone.  We left and Albert took
25   the boat the next day.
```

Deposition of Sadie Gentry                      Taken: 11/01/2021

Page 99

```
 1              (A SHORT BREAK WAS TAKEN)
 2    EXAMINATION BY MR. BEZOU:
 3    Q.    On the date of the fall, at the time of
 4    the fall, I know we talked about how much
 5    space there would be from the stern of the
 6    boat to the bulkhead generally, you said about
 7    two to three feet?
 8    A.    Yes.
 9    Q.    Can you tell me on the day of Ms.
10    Darby's fall specifically how far apart it was
11    or do you know?
12    A.    I don't know.
13    Q.    Do you remember a boat named the CHINA
14    DOLL?
15    A.    Uh-huh (affirmative response).
16    Q.    Whose boat was that?
17    A.    David's.
18    Q.    Were you aware either from David or
19    independently that Ms. Darby had photographed
20    David on the CHINA DOLL back in 2002?
21    A.    I didn't know that.
22    Q.    I believe you said you don't remember
23    having any discussions with Ms. Darby at the
24    Captain's Ball?
25    A.    No.
```

Page 100

1    Q.    We know that you testified that this

2    was secured to the back of the boat because it

3    was heavy and the weight was keeping it there,

4    was it secured to the bulkhead with anything?

5    A.    It was long, a lot of weight.

6    Q.    I figure this table is, what, 8 feet

7    long?

8              MR. COSTA:

9                   Uh-huh (affirmative response).

10   EXAMINATION BY MR. BEZOU:

11   Q.    Was the plank as long as this table,

12   longer or shorter if you can recall?

13   A.    A little bit shorter maybe.

14   Q.    I asked you earlier about the LLC

15   document that has your name in the heading and

16   David's name in the heading, and it appears

17   from the documents I'm looking at, it's a

18   partnership agreement between yourself and

19   David Snow; do you recall that?

20   A.    Not really, no.

21   Q.    It was -- well, it says, I'm just going

22   to read it to you and tell me if it sounds

23   familiar, "we own a house and property

24   together and are each 50 percent owners;" is

25   that a true statement.

Deposition of Sadie Gentry                              Taken: 11/01/2021

Page 101

1          MR. COSTA:

2               What year?

3          MR. BEZOU:

4               This was drafted in 2017, it

5     was filed the end of March, 2017.

6          MR. COSTA:

7               Who filed it?

8          MR. BEZOU:

9               Marsiglia, attorney.

10    EXAMINATION BY MR. BEZOU:

11    Q.    I'm just going to read some things in

12    here and I want you to tell me if they're true

13    and accurate to the best of your knowledge.

14    You and David owned a house and property

15    together, correct?

16    A.    In Mississippi.

17    Q.    Are each 50 percent owners, that was

18    the Mississippi property you're talking about?

19    A.    Uh-huh (affirmative response).

20    Q.    Deed and title is in both of our names;

21    is that correct?

22    A.    I suppose so.

23    Q.    We will maintain a joint checking

24    account to be used for related expenses to the

25    partnership; is that true?

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 102

1    A.    We have a joint checking account.

2    Q.    And it's used for related expenses to

3    this partnership; is that true?

4    A.    Yes.

5    Q.    When one partner dies, the survivor

6    will have the use of decedent's one-half

7    usufruct of the house and property for the

8    remainder of the survivor's life to do with it

9    as she or he sees fit; is that true?  That if

10   one of ya'll dies, the other will have the use

11   --

12   A.    -- of that property.

13   Q.    You're saying that's not the New

14   Orleans property?

15   A.    Not the New Orleans property, no.

16   Q.    Why is that?

17   A.    I don't know.  It was something we did

18   after Katrina --

19   Q.    The partnership agreement is written,

20   it says, written February 9, 2017 and amended

21   March 6, 2017, does that clear up anything for

22   you about --

23   A.    No.

24   Q.    But this would have been, this

25   partnership agreement was done prior to Ms.

Deposition of Sadie Gentry                          Taken: 11/01/2021

Page 103

1    Darby's injury, correct?

2    A.    I suppose, yes.

3    Q.    It says, dissolving the partnership

4    with both partners living may occur amicably

5    by one partner agreeing to buy out the other

6    at a fair market value.  So is this

7    partnership ongoing or has it been dissolved?

8    A.    I've totally forgotten about it; David

9    probably has too.

10   Q.    Did you ever buy David out of any

11   portion or did he ever buy you out of any

12   portion of the partnership?

13   A.    Not as I remember.  I don't think so.

14   I'm not sure.

15   Q.    Does this partnership apply to your

16   Royal Street property?

17   A.    No, I don't think so.

18   Q.    Why?

19   A.    I don't know why it should.

20   Q.    Explain that to me if you can?

21   A.    It hasn't come up.  It hasn't been

22   discussed.

23   Q.    Here's my question for you, you live

24   there together?

25   A.    Uh-huh (affirmative response).

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 104

1    Q.    You use funds from a joint checking

2    account to pay the property tax on this

3    property, to do repairs and upkeep?

4    A.    Uh-huh (affirmative response).

5    Q.    It seems to be an identical situation

6    from a maintenance standpoint, cost standpoint

7    of the Mississippi properties that you all

8    owned together, co-owned, so I'm trying to

9    figure out why would the property here in New

10   Orleans be any different?  If y'all are still

11   together, still paying all the expenses out of

12   a joint account, what's different?

13   A.    I don't know.  David's Visa is about to

14   expire, maybe something there, I don't know.

15   Q.    You didn't purchase this home with

16   monies belonging to you and David?

17   A.    This home was purchased pretty much

18   from the money from my condo.

19   Q.    What was the sale price on the condo;

20   do you remember?

21   A.    370 something.

22   Q.    And so this other property cost north

23   of $400,000 if my notes are correct.  So at

24   least a portion of the purchase of the Royal

25   Street property would have been purchased with

Deposition of Sadie Gentry                           Taken: 11/01/2021

Page 105

1    David's funds; is that correct?

2    A.    I think so, yes.

3    Q.    Were you a real estate agent?

4    A.    Me?  No.

5    Q.    You've never been a realtor?

6    A.    No.

7    Q.    Do you know, are you aware that David

8    Snow -- this is Robert Barnett, he's my

9    co-counsel, are you aware that David Snow

10   called Mr. Barnett twice in November of 2018

11   about this incident?

12   A.    No.

13   Q.    Is this your signature above the line

14   that says "Sadie Gentry"?

15   A.    Yes.

16   Q.    And is that David's signature on there

17   as best you can tell?

18   A.    Yes.

19   Q.    And you're familiar with his signature

20   -- this is the partnership agreement that I

21   was just reading from.

22             MR. COSTA:

23                 Where is it recorded?

24             MR. BEZOU:

25                 Secretary of State in Baton

Deposition of Sadie Gentry                    Taken: 11/01/2021

```
                                                    Page 106
  1    Rouge.  We can go off the record.

  2             (OFF THE RECORD DISCUSSION)

  3             MR. BEZOU:

  4                  Do you have any followup?

  5             MR. COSTA:

  6                  No.

  7             MR. BEZOU:

  8                  That's it.

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Deposition of Sadie Gentry                           Taken: 11/01/2021

Page 107

1                    R E P O R T E R ' S   P A G E

2

3        I, HEIDI LaFOND DENNIS, Certified Court

4   Reporter in and for the State of Louisiana,

5   the Officer, as defined in Rule 28 of the

6   Federal Rules of Civil Procedure and/or

7   Article 1434 (B) of the Louisiana Code of

8   Civil Procedure, before whom this sworn

9   testimony was taken, do hereby state on the

10  record;

11        That, due to the interaction in the

12  spontaneous discourse of this proceeding,

13  dashes (--) have been used to indicate pauses,

14  changes in thought, interruptions by another

15  speaker, and/or talkovers; that same is the

16  proper proceeding, and that the dashes (--) do

17  not indicate that words or phrases have been

18  left out of this transcript;

19        That any words and/or names which could

20  not be verified through reference material

21  have been denoted with the phrase "(spelled

22  phonetically)."

23

24                    HEIDI LaFOND DENNIS
                     CERTIFIED COURT REPORTER
25

Deposition of Sadie Gentry                    Taken: 11/01/2021

Page 108

```
 1                   C E R T I F I C A T E

 2

 3        I, HEIDI LaFOND DENNIS, Certified Court
    Reporter in and for the State of Louisiana, as
 4  the officer before whom this testimony was
    taken, do hereby certify that, SADIE GENTRY,
 5  on Monday, November 1, 2021, after having been
    first duly sworn by me upon authority of
 6  R.S.37:2554, did testify as hereinabove set
    forth in the foregoing, one hundred nine
 7  pages;
         That this testimony was reported by me
 8  in the stenotype reporting method, was
    prepared and transcribed by me or under my
 9  personal direction and supervision, and is a
    true and correct transcript to the best of my
10  ability and understanding; that the transcript
    has been prepared in compliance with
11  transcript format guidelines required by
    statue or by rules of the board, and that I am
12  informed about the complete arrangement,
    financial or otherwise, with the person or
13  entity making arrangements for deposition
    services;
14       That I have acted in compliance with the
    prohibition on contractual relationships, as
15  defined by Louisiana Code of Civil Procedure
    Article 1434 and in rules and advisory
16  opinions of the board; that I have no actual
    knowledge of any prohibited employment or
17  contractual relationship, direct or indirect,
    between a court reporting firm and any party
18  litigant in this matter nor is there any such
    relationship between myself and a party
19  litigant in this matter;
         That I am not related to counsel or to the
20    parties herein, nor am I interested in the
    outcome of this matter;
21       This certification is valid only for a
    transcript accompanied by my original
22  signature and original required seal on this
    page.

23

24                      HEIDI LaFOND DENNIS
                        CERTIFIED COURT REPORTER
25
```

Deposition of Sadie Gentry                              Taken: 11/01/2021

Page 109

```
 1        W I T N E S S'  C E R T I F I C A T E

 2

 3              I, SADIE GENTRY, do hereby certify

 4     that I have read or have had read to me the

 5     foregoing transcript of my testimony and find

 6     same to be true and correct with the exception

 7     of any changes noted on the attached amendment

 8     sheet:

 9

10     CHECK ONE BOX BELOW:

11     ( )   Without corrections.

12     ( )   With corrections, deletions, and/or

13     additions as reflected on the errata sheet

14     attached hereto.

15

16

17

18

19

20

21

22                        SADIE GENTRY

23

24

25
```

107

R E P O R T E R'S   P A G E

1

2

3        I, HEIDI LaFOND DENNIS, Certified Court

4  Reporter in and for the State of Louisiana,

5  the Officer, as defined in Rule 28 of the

6  Federal Rules of Civil Procedure and/or

7  Article 1434 (B) of the Louisiana Code of

8  Civil Procedure, before whom this sworn

9  testimony was taken, do hereby state on the

10  record;

11       That, due to the interaction in the

12  spontaneous discourse of this proceeding,

13  dashes (--) have been used to indicate pauses,

14  changes in thought, interruptions by another

15  speaker, and/or talkovers; that same is the

16  proper proceeding, and that the dashes (--) do

17  not indicate that words or phrases have been

18  left out of this transcript;

19       That any words and/or names which could

20  not be verified through reference material

21  have been denoted with the phrase "(spelled

22  phonetically)."

23

24               *Heidi LaFond Dennis*
            HEIDI LaFOND DENNIS
            CERTIFIED COURT REPORTER

25

HEIDI LaFOND DENNIS
ALLIANCE COURT REPORTERS, LLC
(504) 488-6624

108

C E R T I F I C A T E

I, HEIDI LaFOND DENNIS, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that, SADIE GENTRY, on Monday, November 1, 2021, after having been first duly sworn by me upon authority of R.S.37:2554, did testify as hereinabove set forth in the foregoing, one hundred nine pages;

That this testimony was reported by me in the stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statue or by rules of the board, and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangements for deposition services;

That I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board; that I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter nor is there any such relationship between myself and a party litigant in this matter;

That I am not related to counsel or to the parties herein, nor am I interested in the outcome of this matter;

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

*Heidi LaFond Dennis*

HEIDI LaFOND DENNIS
CERTIFIED COURT REPORTER

HEIDI LaFOND DENNIS
ALLIANCE COURT REPORTERS, LLC
(504) 488-6624